1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                    No.  2:13-CR-00330-KJM-3

12                 Plaintiff,

13        v.                                      ORDER

14   JOHN JAMES KASH,

15                 Defendant.

16

17

18              On October 13, 2015, defendant John James Kash ("defendant" or "Kash") moved

19   to suppress physical evidence seized on May 2, 2012 following a traffic stop.  ECF No. 234.

20   Kash also requested an evidentiary hearing.  *Id.*  The United States opposed the motion.  ECF

21   No. 242.  The court held a hearing on the matter on October 28, 2015, at which defendant

22   appeared pro se with standby defense counsel Gregory Foster; Christiaan Highsmith and Justin

23   Lee appeared for the United States.  At hearing, the court submitted defendant's motion and

24   directed the United States to lodge a copy of the dashboard camera video footage from the May

25   2012 traffic stop.  *See* ECF No. 256.  The United States lodged a copy of the video on October

26   28, 2015.  *See* ECF No. 261.

27

28

1    After reviewing the video, the court set a brief evidentiary hearing for November

2  9, 2015, before commencing the first day of trial.  ECF No. 273.  The court set the hearing for the

3  limited purpose of allowing Kash to question Utah Highway Patrol Trooper Chamberlin Neff

4  ("Trooper Neff" or "Neff") and test Kash's theory that the May 2, 2012 traffic stop was not based

5  on a reasonable suspicion of wrongful conduct.  *Id.*  Specifically, Kash argues Neff's stopping

6  him for following a Jeep too closely is not consistent with the facts because, in Utah, Kash was

7  always in front of the Jeep.  On November 5, 2015, the government moved to continue the

8  evidentiary hearing to November 12, 2015, because requiring Trooper Neff to appear on the

9  scheduled date created a hardship.  ECF No. 275.  The government agreed to not mention the

10  May 2, 2012 traffic stop in its opening statement or introduce any of the evidence subject to the

11  motion to suppress until the court had ruled on the suppression motion.  The court granted the

12  government's motion to continue and then held the evidentiary hearing on November 12, 2015,

13  before commencing the third day of trial.  After considering the evidence and further argument

14  presented at the evidentiary hearing, the court DENIED defendant's Motion to Suppress, as

15  explained below.

16  I.    FACTUAL BACKGROUND

17       A.    Dashboard Camera Video Footage and Incident Report

18       The following facts are established by the dashboard camera video footage of the

19  encounter and the Incident Report of Trooper Neff, Bates Nos. 12678–12684, ECF No. 242-1.

20  On May 2, 2012, on interstate highway I-80 outside Salt Lake City, Utah, Trooper Neff reported

21  he observed a Ford Fusion sedan following too closely behind a Jeep Rubicon.  At approximately

22  11:31 a.m., Trooper Neff caught up to both vehicles and pulled over the Ford Fusion, a rental car

23  driven by defendant.

24       Once the Ford Fusion was pulled over on the side of the road, Trooper Neff

25  approached the vehicle and observed Kash sitting in the driver's seat.  When Neff asked Kash if

26  he was traveling with the Jeep, Kash responded that he was and that his girlfriend was in the Jeep.

27  The video records Trooper Neff telling Kash he had pulled him over for following too closely to

28  the Jeep and asking for Kash's driver's license and rental car agreement.  Kash exited his vehicle

2

1  to retrieve his rental agreement from the trunk.  The rental agreement stated that Kash had rented

2  the vehicle in Sacramento, California on April 18, 2012.

3        Trooper Neff invited but did not require Kash to join him in the front seat of his

4  vehicle while he typed out Kash's citation.  While Trooper Neff was running checks and typing

5  out the citation, Kash and Neff discussed Kash's cross-country travels with Jamie Adams.  Kash

6  confirmed that the Jeep belonged to Jamie Adams.  At one point, Kash indicated that Adams had

7  sent him a text message stating she had pulled off the highway to get gas.  Trooper Neff grew

8  suspicious of Kash's explanation for his cross-country trip based on several inconsistencies and

9  apparent contradictions in Kash's story.  For example, Kash told Neff he was currently

10  unemployed; he said he and Adams drove cross country in two cars simply because he is allergic

11  to her dog; Kash said he had $9,000 to $10,000 in his car from selling construction equipment and

12  gambling; Kash changed his timeline during their conversation; and the account Kash provided of

13  their visit to Pittsburgh was vague and lacked details.  At approximately 11:39 a.m., Trooper Neff

14  asked Kash for his consent to search the Ford Fusion.  Kash responded, "if you need to," and

15  handed Trooper Neff his key ring, which contained a Master Lock key partially wrapped in

16  plastic.  In the trunk of the Ford Fusion, Trooper Neff found two stacks of $100 bills rubber

17  banded together and an empty duffel bag that smelled like marijuana.  Inside the center console of

18  the vehicle, Trooper Neff located what looked like a pay/owe ledger detailing marijuana sales,

19  marijuana strains, and prices paid for marijuana.

20        At approximately 11:42 a.m., Trooper Neff radioed dispatch to send a trooper to

21  the gas station near the off ramp where he had seen the Jeep exit the highway.  Troopers Rob

22  Cowart and Kyle Ball responded and arrived at the 66 gas station to look for the Jeep.  At 11:45

23  a.m., Trooper Neff detained Kash; however, Kash and Neff then caravanned from the traffic stop

24  to the 66 gas station in their own vehicles.

25        Once they arrived at the 66 gas station, Kash identified Jamie Adams' Jeep.  In

26  response to questioning, Kash indicated that the Jeep belonged to Adams and that she had driven

27  it to Pittsburgh.  When asked whether anything in the Jeep belonged to him, Kash said, "Not that I

28  know of."  When asked if the Jeep contained large amounts of money or drugs, Kash said no.

3

1   When asked about amounts of cash over $10,000, Kash indicated that the money he and Adams

2   had acquired selling construction equipment and gambling was located with him and that he did

3   not know of anything inside the Jeep.

4         While Troopers Cowart and Ball searched the area around the gas station for Jamie

5   Adams, Trooper Neff ran his drug detection K-9 around the Jeep.  The K-9 alerted to the trunk of

6   the Jeep, and tore open the back zippered window flap.  At approximately 11:59 a.m., Trooper

7   Neff spoke to Jamie Adams.  Adams said that she had driven the Jeep to Pittsburgh and that all

8   the belongings in the Jeep were hers.  Adams also indicated that nothing in the Jeep belonged to

9   Kash and that the Jeep contained neither large amounts of cash nor drugs.  Trooper Neff asked

10  Adams for her consent to search the Jeep and she refused.  Trooper Neff then told Adams he

11  would search the Jeep without her consent because the K-9 alert gave him probable cause.

12        At approximately 12:04 p.m., Trooper Neff began searching the Jeep.  He located

13  a black tool box locked with a Master Lock.  Adams said that she had left the key to the tool box

14  in California.  After recalling that Kash had a Master Lock key on his key ring, Neff asked Kash

15  for his key ring.  The Master Lock key was missing, except for the plastic piece of the key.  It

16  appeared as though the key had recently been broken off.  When asked, Kash said that the tool

17  box did not belong to him; Adams indicated that the tool box belonged to her.  The Troopers

18  forced open the tool box and saw two vacuum-sealed bags containing $60,000 in cash.  Neff

19  asked Kash if the money belonged to him and Kash expressly disclaimed ownership of the

20  money.

21      B.    Evidentiary Hearing

22        At the evidentiary hearing on November 12, 2015, Trooper Neff testified that he

23  pulled over Kash's Ford Fusion because he was following too closely to the Jeep.[1]  Neff testified

24  that the primary cause of accidents along that stretch of highway was cars following too closely.

25  He has been working in law enforcement for ten years, and out of the 14,000 traffic stops he has

26

27  _____

28       [1] The transcript from the evidentiary hearing is on docket at ECF No. 290.

1    executed in that time, he estimated that around 1,500 to 2,000 were for following too closely or a

2    rear end contact.

3            Trooper Neff testified that on May 2, 2012, he first observed Kash driving

4    westbound while Neff was traveling eastbound, on the other side of a median strip.[2]  Neff's vision

5    of the westbound lanes was unobstructed, because it was a clear day, the highway was flat, and

6    the center median divider was only 2.5 to 3-feet high.  To measure the distance between cars,

7    Neff said officers can calculate the time in seconds between two cars passing a fixed object, or

8    they can use their experience to estimate the number of car lengths between the two cars.

9    Trooper Neff testified that he used the car length method for calculating whether Kash was

10   following the Jeep too closely.  He testified that the minimum permissible distance between cars

11   driving at a speed limit of 65 miles per hour is five to six car lengths, and that he observed Kash

12   traveling about one car length behind the Jeep.  Neff testified that he has acquired the learned

13   skill of estimating distances through his experience.

14           When asked why the dashboard camera had not recorded the traffic violation,

15   Trooper Neff explained that it took him 1 to 1.5 minutes to turn around at a divider in the median

16   strip and then catch up to Kash's vehicle traveling in the westbound direction of the highway.

17   The dashboard camera only begins recording if the officer presses a record button, turns on the

18   emergency lights and equipment, or drives at a speed of 100 miles per hour or higher.  When

19   Kash asked whether an agency had contacted him and instructed him to make an investigative

20   stop of Kash, and specifically whether the stop was a "whisper stop," Neff responded, "No."

21           Kash did not testify at the evidentiary hearing.  At the hearing's conclusion, he

22   said would like to elicit testimony from Jamie Adams.  He proffered that she would say Kash had

23   always been in front of her during the time they had been driving in Utah.

24

25

26 ─────────────────
            [2] Trooper Neff initially could not recall whether he was traveling or parked at the time he
27   observed Kash following too closely.  After his memory was refreshed with the Incident Report,
     he testified that he was traveling when he saw Kash.
28

II.     DISCUSSION

At the October 28, 2015 hearing, Kash confirmed that he disputes only two facts from Neff's Incident Report: he asserts he was not driving too closely behind Adams' Jeep before he was pulled over, and he says the tool box found in the Jeep belonged to him. *See* ECF No. 249 (Reply).  Kash argues that the physical evidence found in the Ford Fusion and Jeep should be suppressed for five reasons: the traffic stop lacked a proper justification; the traffic stop was pretextual; the traffic stop was improperly prolonged; Kash did not voluntarily consent to the search of the Ford Fusion; and the evidence found in the tool box inside the Jeep was unlawfully obtained. *See id.*; ECF No. 234 (Mot. Suppress).  The court addresses each argument and examines the legality of each government action in the sequence of events following the traffic stop on May 2, 2012.

A.      Justification for Initial Stop of the Ford Fusion

1.      Whether Trooper Neff Had Reasonable Suspicion

Trooper Neff reported that he pulled Kash over for following Adams' Jeep too closely.  ECF No. 242-1 at 3–4.  According to the Incident Report, Kash's Ford Fusion had passed the Jeep by the time Neff caught up to the vehicles and made the traffic stop. *Id.* at 3. Kash argues he did not follow Adams' Jeep too closely, and that he was in fact traveling in front of the Jeep the entire time.  ECF No. 249.  The dashboard camera video footage does not show the reported traffic violation and only begins shortly before Trooper Neff pulled Kash over, at which point the video footage shows Kash's Ford Fusion traveling in front of the Jeep.  This footage is consistent with both Trooper Neff's and Kash's accounts of the occurrences leading up to the traffic stop.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Because a traffic stop implicates the Fourth Amendment, it must be based on a reasonable suspicion that the vehicle's occupants have broken the law. *United States v. Lopez-Soto*, 205 F.3d 1101, 1104–05 (9th Cir. 2000); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002).  To determine whether an officer had a reasonable suspicion that a traffic violation had

1   occurred, courts must examine the "totality of the circumstances" of each case to see whether the

2   detaining officer had a "particularized and objective basis" for suspecting wrongdoing.  *Arvizu*,

3   534 U.S. at 273.  "An officer is entitled to rely on his training and experience in drawing

4   inferences from the facts he observes, but those inferences must also 'be grounded in objective

5   facts and be capable of rational explanation.'"  *Lopez-Soto*, 205 F.3d at 1105 (quoting *United*

6   *States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996)).  When the admission of evidence is

7   challenged on constitutional grounds, the prosecution must prove by a preponderance of the

8   evidence that the evidence is admissible.  *United States v. Matlock*, 415 U.S. 164, 177 n.14

9   (1974); *Lego v. Twomey*, 404 U.S. 477, 488–89 (1972).

10          Here, the court finds that Trooper Neff had a reasonable suspicion that Kash had

11  committed the traffic violation of following a vehicle too closely.  First, Trooper Neff's testimony

12  at the evidentiary hearing was credible and consistent with his Incident Report and dashboard

13  camera video footage.  Neff had reason to be checking for cars following too closely, given the

14  high incidence of traffic accidents in that stretch of highway caused by following too closely. He

15  confirmed that he pulled over Kash because he was following the Jeep too closely, and Neff

16  grounded his decision in objective facts and observations.  *See* ECF No. 242-1 at 3.  Specifically,

17  Kash was traveling about one car length behind the Jeep.[3]  This testimony establishes that

18  Trooper Neff had a "particularized and objective basis" for suspecting wrongdoing.  *See Arvizu*,

19  534 U.S. at 273; *Lopez-Soto*, 205 F.3d at 1105.

20          Second, Trooper Neff's testimony did not expose any inherent inconsistency or

21  provide evidence that Neff had an ulterior motive for making the traffic stop.  Trooper Neff

22  testified that his vision was unobstructed, and that his experience allowed him to easily estimate

23  the distance between vehicles.  He also testified he was not asked or instructed by any other

24  agency to make an investigatory stop of Kash.  Although Kash argued at the hearing that it would

25  have likely taken more than 1.5 minutes for Trooper Neff to turn around and catch up with Kash

26  _____

27          [3] Although the Incident Report states that Trooper Neff had estimated that Kash was
    following less than one second behind the Jeep, Neff testified that "one second" and "one car
    length" are equivalent measurements in this context.

28

1    to make the traffic stop, the court finds that this possible discrepancy does not undermine Trooper

2    Neff's credibility on the issue of whether Kash was following too closely.  The court finds that

3    the government has established the lawfulness of the initial traffic stop.

4                    2.        Proffer Regarding Adams' Testimony

5                    As noted, at the close of the evidentiary hearing, Kash for the first time expressed

6    a desire to also question Jamie Adams, the driver of the Jeep.[4]  Kash said he would like to elicit

7    testimony from Adams that she was driving behind Kash when Trooper Neff saw them on May 2,

8    2012.  The court concluded that such testimony was not required, because even if Adams testified

9    that she was driving behind Kash, it would not provide grounds to suppress the evidence.  *See*

10   *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (decision whether to grant or deny

11   request for evidentiary hearing lies in reasoned discretion of the court); *United States v. Howell*,

12   231 F.3d 615, 621 (9th Cir. 2000) ("[An evidentiary hearing] will not be held on a defendant's

13   pre-trial motion to suppress merely because a defendant wants one.  Rather, the defendant must

14   demonstrate that a significant disputed factual issue exists such that a hearing is required."

15   (citation omitted)).

16                   The Supreme Court has held that "in order to satisfy the 'reasonableness'

17   requirement of the Fourth Amendment, what is generally demanded of the many factual

18   determinations that must regularly be made by agents of the government . . . is not that they

19   always be correct, but that they always be reasonable."  *Illinois v. Rodriguez*, 497 U.S. 177, 185–

20   86 (1990) (holding search is valid if officer had reasonable belief that individual had authority to

21   give consent, even if belief mistaken); *see Hill v. California*, 401 U.S. 797, 803–04 (1971)

22   (upholding search incident to an arrest, even though arrest made of wrong person); *Lopez-Soto*,

23   205 F.3d at 1106 (collecting cases); *United States v. Hatley*, 15 F.3d 856, 859 (9th Cir. 1994)

24   (upholding warrantless search of vehicle police reasonably believed was mobile but was in fact

25   immobile).  In *Brinegar v. United States*, 338 U.S. 160 (1949), the Supreme Court explained,

26   _____

27          [4] At the October 28, 2015 hearing, Kash had only requested the opportunity to examine
     Trooper Neff at an evidentiary hearing.  Kash did not subpoena Adams to appear at the
     evidentiary hearing.

28

1   "Because many situations which confront officers in the course of executing their duties are more

2   or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must

3   be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

4   *Id.* at 176.

5          The testimony Kash sought to elicit from Adams would at most suggest Trooper

6   Neff made a factual mistake; Kash did not contend Adams' testimony could prove Neff was lying

7   or had not actually believed Kash's Ford Fusion was following the Jeep too closely.  Kash was

8   not able to articulate how Adams' testimony could have changed the outcome under the relevant

9   legal standards.  The court finds that even if Trooper Neff had confused the vehicles, such a

10  mistake would have been objectively reasonable.  In *United States v. Lang*, 81 F.3d 955 (10th Cir.

11  1996), for comparison, the Tenth Circuit upheld a stop based on reasonable misidentification of a

12  vehicle's passenger, even though the physical characteristics of the two individuals were

13  "patently different."  *Id.* at 966.  The suspect the police were pursuing was described as 5'3" to

14  5'6" in height, weighing 140 to 150 pounds, with a shaved head or a closely cropped hairstyle and

15  facial hair, whereas the passenger in the vehicle stopped by the police was between 5'10" and

16  6'0" tall, weighed 160 to 190 pounds, and had a different hairstyle.  *Id.*  In evaluating the

17  reasonableness of the officer's mistake, the court considered the brief time period the officer had

18  to observe the passenger and the difficulty of identifying someone from a moving vehicle.  *Id.*

19  Here, the two cars were traveling together, Neff was traveling in the opposite direction when he

20  saw the cars, and he only had a brief moment to observe the cars as he passed by heading the

21  opposite direction.  As a result, the court finds on the record before it that even if Adams'

22  testimony somehow established conclusively that Kash was traveling in front of her Jeep, Trooper

23  Neff's confusion would have been objectively reasonable.[5]

24          Given the late timing of Kash's request, on the third day of trial, and the court's

25  conclusion that Adams' testimony likely would not have affected the outcome of the motion, the

26

27          [5] If Adams testifies at trial, the court will remain alert to any evidence that might cause it
    to revisit this conclusion.

28

9

1   court denied Kash's request to continue the evidentiary hearing in order to elicit testimony from

2   Adams.  *See Walczak*, 783 F.2d at 857; *Howell*, 231 F.3d at 621.  As the court let him know,

3   Kash may call Adams to testify in any case in defense, or question Adams regarding her location

4   relative to Kash's car on May 2, 2015 if the government calls her to testify during its case in

5   chief.

6           B.      Whether Traffic Stop Was "Pretextual"

7                   Kash further asserts the traffic stop was "pretextual."  ECF No. 249 at 2.  "A

8   pretextual stop occurs when the police use a legal justification to make the stop in order to search

9   a person or place, or to interrogate a person, for an unrelated serious crime for which they do not

10  have the reasonable suspicion necessary to support a stop."  *United States v. Cannon*, 29 F.3d

11  472, 474 (9th Cir. 1994) (citations omitted).  The proper inquiry is "whether a reasonable officer

12  'would have' made the stop anyway, apart from his suspicions about other more serious criminal

13  activity."  *Id.* at 476.  The subjective intentions of the officers involved are not relevant to this

14  analysis.  *Whren v. United States*, 517 U.S. 806, 813–15 (1996); *see also Arkansas v. Sullivan*,

15  532 U.S. 769, 771–72 (2001) (per curiam) (upholding search of motorist's car for crime not

16  related to traffic offense).

17                  Here, the court finds that a reasonable officer would have made a brief traffic stop

18  based on Neff's observation that the Ford Fusion followed the Jeep too closely.  *Cf. United States*

19  *v. Gutierrez-Mederos*, 965 F.2d 800, 803 (9th Cir. 1992) (violation of following another vehicle

20  too closely provides founded suspicion for brief investigatory stop).  This is especially true given

21  Trooper Neff's testimony that the primary cause of accidents on that stretch of highway was cars

22  following too closely.  Accordingly, the initial traffic stop did not violate Kash's Fourth

23  Amendment rights.

24          C.      Duration of Traffic Stop

25                  Kash also contends that the traffic stop was unlawfully prolonged, because

26  Trooper Neff abandoned his initial mission of writing a ticket or issuing a warning.  ECF No.

27  234.  "[A] seizure that is justified solely by the interest in issuing a warning ticket to the driver

28  can become unlawful if it is prolonged beyond the time reasonably required to complete that

1    mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  "Because addressing the infraction is

2    the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose,"

3    absent the reasonable suspicion ordinarily demanded to justify detaining an individual.  *Rodriguez*

4    *v. United States*, __ U.S. __, 135 S. Ct. 1609, 1614–15 (2015) (citation and quotation marks

5    omitted) (alteration in original).  Following a valid traffic stop, an officer can check the driver's

6    license, determine whether there are outstanding warrants against the driver, and inspect the

7    automobile's registration and proof of insurance, because these checks ensure that vehicles on the

8    road are operated safely and responsibly.  *Id.* at 1615 (holding that dog sniff, by contrast, is not an

9    ordinary incident of a traffic stop and is not fairly characterized as part of officer's traffic

10   mission); *see also United States v. Banuelos-Romero*, 597 F.3d 763, 766–67 (5th Cir. 2010);

11   *United States v. Munoz*, 590 F.3d 916, 920–21 (8th Cir. 2010) ("[A]fter making a traffic stop, an

12   officer may detain the driver while he completes a number of routine but somewhat time-

13   consuming tasks related to the traffic violation, such as computerized checks of the vehicle's

14   registration and the driver's license and criminal history, and the writing up of a citation or

15   warning." (citation and quotation marks omitted)).

16            After Trooper Neff pulled Kash's Ford Fusion to the side of the road at

17   approximately 11:31 a.m., Neff requested Kash's driver's license and rental agreement.  ECF No.

18   242-1 at 3–4.  Neff invited Kash to sit in the front passenger seat of the police car while he ran

19   routine checks and typed up the citation.  *Id.* at 4.  According to *Rodriguez*, these activities are

20   ordinary incidents of a traffic stop and are part of the officer's traffic mission.  *Rodriguez*, 135

21   S. Ct. at 1615.  Trooper Neff did not prolong the traffic stop beyond what was reasonably

22   necessary to perform these tasks.

23            Over the course of their conversation, Trooper Neff grew suspicious that Kash was

24   involved in more extensive criminal conduct, based on several inconsistencies and apparent

25   contradictions in his voluntary responses to Neff's questions.  *See* ECF No. 242-1 at 4.

26   Specifically, Kash told Neff he was currently unemployed; he said he and Adams drove cross

27   country in two cars simply because he is allergic to her dog, which on its face is not rational

28   fiscally, particularly for someone who is unemployed; Kash said he had $9,000 to $10,000 in his

1    car from selling construction equipment and gambling; Kash changed his timeline during their

2    conversation; and Kash's account of what he and Adams did during their visit to Pittsburgh was

3    vague and did not include the types of details one would ordinarily expect.  *Id.*  At 11:39 a.m.,

4    approximately eight minutes after the initial stop, Trooper Neff asked Kash for consent to search

5    the Ford Fusion.  Given the totality of the circumstances, the court finds that at the time Neff

6    searched the Ford Fusion, he had a particularized and objective basis for suspecting Kash was

7    engaged in more extensive criminal conduct than simply following Adams' Jeep too closely.  *See*

8    *Arvizu*, 534 U.S. at 273 (reasonable suspicion standard).  This reasonable suspicion justified

9    extending the traffic stop beyond its initial traffic mission.  *See Rodriguez*, 135 S. Ct. at 1615–17

10   (reasonable suspicion required to justify detaining individual beyond completion of traffic

11   infraction investigation).  The traffic stop was not unlawfully prolonged.

12          D.      Consent to Search the Ford Fusion

13                  Finally, as to the initial stop, Kash argues that Trooper Neff intimidated him, and

14   that his consent to the search of the Ford Fusion was not given voluntarily.  "Voluntariness poses

15   a question of fact to be determined from the totality of circumstances."  *Gutierrez-Mederos*, 965

16   F.2d at 803 (upholding validity of vehicle search where evidentiary record made clear it was

17   based on voluntary consent).  The court should consider "those [facts] that, in the district court's

18   judgment, in fact influenced the defendant's decision to consent to the search."  *United States v.*

19   *Vasquez*, 858 F.2d 1387, 1389 (9th Cir. 1988) (quoting *United States v. Gomez*, 846 F.2d 557,

20   560 (9th Cir. 1988)).  The Ninth Circuit has found the following factors relevant to whether

21   consent is voluntary:

22              (1) whether the defendant was in custody; (2) whether the arresting
                officers have their guns drawn; (3) whether *Miranda*[6] warnings
23              have been given; (4) whether the defendant was told he has a right
                not to consent; and (5) whether the defendant was told a search
24              warrant could be obtained.

25   *Id.* at 1389–90.

26

27   ───────────────
                    [6] *Miranda v. Arizona*, 384 U.S. 436 (1966).
28

                                        12

1    At the October 28, 2015 hearing, the court asked defendant to explain why the

2    search was not consensual.  Kash responded that if he had not consented, it would have delayed

3    the stop and Trooper Neff would have used the K-9 that was in his police car to search the Ford

4    Fusion.  When asked whether Neff told him the stop would be delayed and the K-9 would search

5    his car if he did not consent, Kash responded that Neff never said it.  Based on the available

6    evidence, it appears Kash drew this conclusion himself and determined it was in his best interest

7    to consent to the search.[7]  Such a calculation does not make consent involuntary under the Fourth

8    Amendment.  The dashboard camera video footage of the traffic stop shows that Trooper Neff did

9    not threaten or coerce defendant into giving his consent.  Neff simply asked Kash if he could

10   search his vehicle, and Kash responded, "if you need to."  Kash then handed Neff his keys.

11   Although Trooper Neff did not tell Kash he had a right not to consent, their interactions had been

12   conversational and cordial up to that point, Kash had not been required to sit in Neff's car or

13   taken into custody, and Trooper Neff did not draw his gun.  *See Vasquez*, 858 F.2d at 1389–90.

14   Kash did not protest or object to the search at any point.  Based on the totality of the

15   circumstances, the court finds Kash's consent was given voluntarily, and was not the result of

16   duress or coercion.  The search of the Ford Fusion did not violate Kash's Fourth Amendment

17   rights.

18       E.    Search of the Jeep and Tool Box

19           1.    Standing

20   "Fourth Amendment rights are personal rights which, like some other

21   constitutional rights, may not be vicariously asserted."  *Rakas v. Illinois*, 439 U.S. 128, 133–34

22   (1978) (citations omitted).  A defendant has standing to challenge the legality of a search on

23   Fourth Amendment grounds only if he had a property interest protected by the Fourth

24   Amendment that was interfered with or had a reasonable expectation of privacy that was invaded

25   by the search.  *United States v. Padilla*, 111 F.3d 685, 688 (9th Cir. 1997); *see also Rakas*, at

---

26   [7] Although Trooper Neff testified at the evidentiary hearing that he "probably" would
27   have conducted a K-9 sniff of the Ford Fusion if Kash had withheld his consent, this testimony is
     speculative and does not affect the court's analysis of whether Kash voluntarily gave his consent.

28

1    138–49; *Rawlings v. Kentucky*, 448 U.S. 104, 104 (1980); *United States v. Zermeno*, 66 F.3d

2    1058, 1062 (9th Cir. 1995).  Courts generally have found that a conspirator does not have a

3    property interest or reasonable expectation of privacy in a car that he was not driving and did not

4    own.  *Padilla*, 111 F.3d at 686, 688.

5                     In the dashboard camera video footage, both Kash and Adams indicated that the

6    Jeep belonged to Adams and that Kash had no property in the Jeep.  When the officers located the

7    tool box in the Jeep, Adams and Kash said that the tool box belonged to Adams.  At the October

8    28, 2015 hearing, however, Kash asserted that he in fact owned the tool box that was found in the

9    Jeep, and that his ownership was established by the fact that he was in possession of the key to

10   the tool box at the time of the search.  Even assuming Kash owned the tool box, and has standing

11   to challenge the search of the tool box, the search of the Jeep and tool box did not violate his

12   Fourth Amendment rights for the reasons discussed below.

13                   2.    K-9 Sniff

14                   The initial K-9 sniff of Adams' Jeep was lawful.  The Supreme Court has held that

15   subjecting property within a public place to a trained narcotics detection K-9 is not a "search"

16   within the meaning of the Fourth Amendment.  *United States v. Place*, 462 U.S. 696, 707 (1983)

17   ("We are aware of no other investigative procedure that is so limited both in the manner in which

18   the information is obtained and in the content of the information revealed by the procedure.").

19   Here, the officers conducted a K-9 sniff around Adams' Jeep while it was parked at the 66 gas

20   station, which is a public place.  *See Payton v. New York*, 445 U.S. 573, 587 (1980)

21   (distinguishing between warrantless seizure in open area and such a seizure on private premises to

22   which access is not otherwise available for the seizing officer) (citing *G. M. Leasing Corp. v.*

23   *United States*, 429 U.S. 338, 354 (1977)).  As a result, the K-9 sniff of Adams' Jeep did not

24   violate the Fourth Amendment.

25                   3.    Search of Jeep

26                   The search of the Jeep following the K-9 sniff also was lawful.  The Supreme

27   Court has held that officers may search a vehicle for contraband goods concealed and illegally

28   transported without a warrant, when the officer has probable cause.  *Carroll v. United States*, 267

                                              14

1    U.S. 132, 153–56 (1925); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("If a car is

2    readily mobile and probable cause exists to believe it contains contraband, the Fourth

3    Amendment . . . permits police to search the vehicle without more." (citation omitted)).  A police

4    officer has probable cause to conduct a search when, given the totality of the circumstances, "'the

5    facts available to [him] would warrant a [person] of reasonable caution in the belief' that

6    contraband or evidence of a crime is present."  *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013)

7    (alterations in original) (quoting *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion)).

8              The Supreme Court has held that a K-9 alert can give an officer probable cause to

9    search a vehicle when the drug-detection dog is well-trained and reliable, and other circumstances

10   surrounding a particular alert do not undermine the case for probable cause.  *Id.* at 1055–59.

11   Here, when Trooper Neff released his K-9, Tank, to sniff Adams' Jeep, Tank made his way to the

12   rear of the vehicle and began to bite the rear of the soft top of the Jeep.  According to the Incident

13   Report, this is one of Tank's trained final responses when he smells the odor of narcotics.  ECF

14   No. 242-1 at 5.  The Incident Report states that Tank is a veteran narcotics canine that has been

15   certified several times in narcotics detection, most recently in February 2012, a mere three

16   months before the May 2012 incident at issue here.  *Id.*  Trooper Neff has been trained on what

17   Tank's alerts and indications are and has strong experience in reading Tank's reactions.  *Id.*  Kash

18   has not challenged the reliability of the K-9 or challenged the circumstances surrounding the

19   dog's alert.  Based on the government's undisputed assertion of the K-9's reliability and a

20   consideration of the totality of the circumstances, the court finds that the K-9's alert gave the

21   officer probable cause to search the Jeep.

22              4.      Search of Tool Box

23              The search of the tool box inside the Jeep raises additional questions.  In

24   determining whether a particular governmental action violates the Fourth Amendment, courts first

25   consider whether the action was regarded as an unlawful search or seizure under the common law

26   of the founding era.  *Wyoming v. Houghton*, 526 U.S. 295, 299 (1999).  When history provides no

27   conclusive answer, courts evaluate the reasonableness of the scope of a search "by assessing, on

28

1    the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the

2    degree to which it is needed for the promotion of legitimate governmental interests." *Id.* at 300.

3              In the context of the automobile exception, the Supreme Court has established that

4    if police officers have probable cause to search a lawfully stopped vehicle, they may conduct a

5    warrantless search of closed containers found inside the vehicle that may conceal the objects of

6    the search. *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798,

7    825 (1982). The Supreme Court in *Ross* held that "[t]he scope of a warrantless search of an

8    automobile . . . . is defined by the object of the search and the places in which there is probable

9    cause to believe that it may be found." *Ross*, 456 U.S. at 824; *see also Safford Unified Sch. Dist.

10   No. 1 v. Redding*, 557 U.S. 364, 388 (2009) ("The Court has generally held that the

11   reasonableness of a search's scope depends only on whether it is limited to the area that is capable

12   of concealing the object of the search."). In *Wyoming v. Houghton*, the Court extended the

13   reasoning of *Ross* to searches of passengers' belongings found in the car. 526 U.S. at 307. The

14   Court reasoned that individuals have a reduced expectation of privacy with regard to the property

15   that they transport in cars that travel public thoroughfares, and "the 'ready mobility' of an

16   automobile creates a risk that the evidence or contraband will be permanently lost while a warrant

17   is obtained." *Id.* at 303-04 (citing *California v. Carney*, 471 U.S. 386, 390 (1985)).

18             Here, during the search of the rear of the Jeep, Trooper Neff located a black tool

19   box that was locked with a new Master lock. ECF No. 242-1 at 6. Adams said that the tool box

20   belonged to her and that she brought it to help fix her Jeep if it broke down. *Id.* Trooper Neff

21   asked Adams where the key for the tool box was, and she said she had left in California. *Id.*

22   According to the Incident Report, Trooper Neff suspected Adams was lying about the contents of

23   the tool box, because she could not use the locked tool box to help her fix her Jeep if she left the

24   key at home in California. *Id.* In Trooper Neff's experience, he had previously dealt with

25   contraband being locked inside secure containers. *Id.* Trooper Neff also remembered that there

26   had been a Master lock key located on the key ring of Kash's rental vehicle. *Id.* When Trooper

27   Neff asked Kash for his keys, the Masker Lock key was missing except for the plastic piece that

28   attaches to the key, which looked as if it had been broken off recently. *Id.* Trooper Neff

1    ultimately used a pair of bolt cutters to open the tool box, and observed several tools, including

2    1/4 inch sockets without a 1/4 inch wrench.  *Id.*  Most of the tools would not be helpful if the Jeep

3    broke down.  *Id.*  Trooper Neff concluded that the tools were purposely placed props in the tool

4    box, so he removed the top shelf and saw newspaper lining the bottom of the box.  *Id.*  He

5    removed the tool box and saw two thin vacuum-sealed bags containing stacks of cash.  *Id.*

6             Based on these facts, the court finds that the scope of the search of the tool box

7    was reasonable under the Fourth Amendment.  Trooper Neff had probable cause to search the

8    Jeep for drugs based on the K-9 alert, and the totality of the circumstances provided a reasonable,

9    objective basis for suspecting there may have been unlawful controlled substances in the locked

10   tool box.  This analysis would not change if the tool box actually belonged to Kash.  First, Kash

11   and Adams each told the officers that the tool box belonged to Adams, so Kash's actual

12   ownership of the tool box likely would not have affected the officers' probable cause analysis.

13   Second, even if the officers suspected that the tool box actually belonged to Kash, the officers had

14   previously found contraband in Kash's Ford Fusion, and there was evidence that Kash and Adams

15   may have been working together, particularly, Kash's possession of the Master Lock key, and

16   their two-car caravan across country.  As a result, it would have been just as likely that the tool

17   box contained controlled substances had the tool box belonged to Kash.  *See Houghton*, 526 U.S.

18   at 304–05 (discussing government's stake in searching passenger's belongings in car).  The

19   search of the tool box did not violate Kash's Fourth Amendment rights.

20   III.    CONCLUSION

21             For the foregoing reasons, defendant's motion to suppress physical evidence

22   seized on May 2, 2012 following a traffic stop is DENIED.

23             IT IS SO ORDERED.

24    DATED:  November 16, 2015.

25

26    _____

27    UNITED STATES DISTRICT JUDGE

28